# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

**EVOLYENE STAFFORD,**            ]
                                  ]
    Plaintiff(s),            ]
                                  ]
vs.                               ]    CV-95-N-2123-NE
                                  ]
**GENERAL MOTORS**                ]
**CORPORATION, et al.,**          ]
                                  ]
    Defendant(s).            ]

FILED 97 JAN 17 PM 12:12 U.S. DISTRICT COURT N.D. OF ALABAMA

ENTERED JAN 17 1997

### Memorandum of Opinion

**I.   Introduction**

Plaintiff Evolyene F. Stafford ("Ms. Stafford"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.*, claims her employer, defendant Saginaw Division of General Motors Corporation ("General Motors"), discriminated against her on the basis of her gender and disability. The defendant has moved for summary judgment, asserting that plaintiff has failed or refused to take advantage of the grievance and arbitration provisions of the national and local collective bargaining agreements between her union and General Motors. Defendant's motion has been fully briefed and submitted for decision. Upon due consideration, the motion will be granted. The action will be dismissed with leave granted to petition to reopen in the event there remain any viable issues following arbitration.

## II.  Undisputed Facts[1]

In 1985 General Motors (GM) hired Evolyene Stafford as an hourly employee at its Limestone County site. In 1988, while working at the plant, Ms. Stafford was exposed to sulfuric acid and treated for chemical poisoning. Thereafter, she was placed on disability leave. She returned to work in 1992 with the medical restrictions that she work in a clean environment, well filtered, and free of chemical fumes. Accordingly, she was temporarily assigned to work in the Yard Crew, under Supervisor Jerry Story, where her duties included picking up paper, cutting grass, and doing general yard work--all tasks within her medical restrictions. It is undisputed that this assignment was pursuant to paragraph 72 of the National Collective Bargaining Agreement between GM and the United Auto Workers which states:

> *E*mployees who *have* been incapacitated at their regular work by injury or compensable occupational disease while employed by the Corporation, will be employed in other work on jobs that *are* operating in the plant which *they* can do without regard to any seniority provisions of this Agreement, except that such employee*s* may not displace employee*s* with longer seniority, provided, however, that by written agreement between local Management and Shop Committee, such employee*s* may be placed or retained on jobs *they* can do without regard to seniority rules. Each three months the name, job classification and seniority date of employees covered by such agreement will be furnished to the Chair*person* of the Shop Committee.

*October 24, 1993 National Agreement Between GM and the UAW (hereinafter National Agreement)* at paragraph 72 (emphasis in original).

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

Ms. Stafford worked without incident in the Yard Crew until Gary Campbell, Supervisor of Labor Relations, received complaints from the Union about Ms. Stafford's transfer. Apparently, these complaints were because Ms. Stafford had "bumped" more senior employees to get the Yard Crew job--a practice not allowed under paragraph 72 of the National Agreement. Robert Armstrong, a union representative, told the plaintiff that people were complaining about her and said she was being moved so that someone else could take the Yard Crew position. Concerned, the plaintiff sought the assistance of management. Larry Blaesing, the personnel director at the plant, told her not to worry because she was doing a good job. In addition, both Mr. Blaesing and another member of management, Billy Stevenson, told the plaintiff she was being moved only because of Union complaints.

After about three months in the Yard Crew, Ms. Stafford was reassigned to the Vehicle Program under Mr. Story. In December 1992, she was reassigned again to the Fab Shop under Roger Dyar. It is undisputed however, that at some point after Ms. Stafford was removed from the Yard Crew, Steven Lee, a male employee also on medical restriction, was placed on the Yard Crew.

Ms. Stafford worked in the Fab shop until June or July of 1995. During that time, she requested to be placed in an equalization group and to be allowed to work overtime.[2] In connection with this request, she asked the Union and Mr. Blaesing, to be placed in a job and left there to do her work without being moved around. Specifically she complained

---

[2] Equalization Groups are specifically mentioned in the National Agreement and are the means by which GM awards overtime to employees with seniority.

3

to Mr. Blaesing that since her injury she has either been sent home or removed from a job and not allowed to work.

In 1995, Ms. Stafford was placed inside the plant to work the Hose Department in Plant 23. While working in the plant, she was exposed to locktite, and suffered further injury. After complaining to her supervisor, Ben Day, and to superintendents James Fuller and Carry Wright, the plaintiff was moved from the plant entirely. She contends that she was later placed back in the plant in a job that did not accommodate her restrictions, and that she filed a grievance with the Union. However, defendant disputes those assertions.

On October 21, 1994, the plaintiff filed her EEOC charge alleging "disparate treatment with respect to job assignments" and that she has been "denied overtime since July 1992." *EEOC Charge.* Ms. Stafford claimed these actions amounted to discrimination based on her sex and disability in violation of Title VII and the ADA. Although the plaintiff was for a time allowed to work overtime, it ceased when the Union began to question her supervisor, Jim Foster, about it. Ms. Stafford has never talked with the Union about doing overtime work, and she feels the Union has not represented her in her effort to be given jobs. Importantly though, it is undisputed that the plaintiff is not concerned about what her actual job is, but only wants to remain in one job without being moved from job to job.

## III.   **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party

4

asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and

6

all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion

Ms. Stafford claims that "since having returned to work, the defendant has moved [her] from position to position," and that the "defendant has refused to permit [her] to work overtime when all other similarly situated employees who do or do not have a disability received substantial overtime." *Complaint* at paragraph 9. She also avers that "she was removed from the [Yard Crew] position as a result of her sex, female." *Id.* at 15. She contends this alleged conduct violates the ADA and Title VII. However, the defendant argues that these claims are barred because Ms. Stafford has not exercised the grievance and arbitration procedures contained in the collective bargaining agreement. The UAW National Agreement provides that:

> It is the policy of General Motors and the UAW that the provisions of this Agreement be applied to all employees covered by this Agreement without discrimination based on race, color, religion, age, sex, national origin or <u>individuals with disabilities as required by appropriate state and federal law</u>. Any claims of violation of this policy or claims of sexual harassment may be taken up as a grievance.

*National Agreement* at paragraph 6a (emphasis in original).[3] The National Agreement continues: "The grievance and arbitration procedure shall be the exclusive contractual procedure for remedying such discrimination claims." *Id.* The parties do not dispute the

---

[3] The National Agreement frequently shifts between underscoring and italicizing for emphasis.

appropriateness of these provisions of the National Agreement to the case at hand. Rather, the dispute centers on whether the agreement itself should be applied to Ms. Stafford, and if so, whether mandatory, binding arbitration is appropriate in Title VII and ADA cases. The defendant wishes this court to hold that the provisions of paragraph 6a prevent the plaintiff from seeking a remedy in this court and that they are therefore entitled to judgment as a matter of law.

### A. The Grievance Procedure

The Eleventh Circuit has stated that "[u]nder normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration." *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992). "Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general." *Id.* "Because the making of the arbitration agreement itself is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests." *Id.*

Beginning at paragraph 28, the National Agreement outlines an atypical "arbitration provision." Never using the word "arbitration," it describes a four step "grievance" process. In step one, "[a]ny employee having a grievance, or one designated member of

a group having a grievance, should first take the grievance up with the *supervisor* who will attempt to adjust[4] it." *National Agreement* at paragraph 28. The agreement continues:

> If the grievance is not adjusted by the *supervisor*, it shall be reduced to writing on forms provided by the Corporation, and signed by the employee involved and one copy shall be given to the *supervisor*. The committee*person* [for that district] shall then take the grievance up with higher supervision with or without another committee*person*, according to the agreed local practice.

*Id.* at paragraph 30 (emphasis in original).

If the case is not adjusted in step one, then the committeeperson may appeal the case to the Shop Committee in step two. *Id.* at paragraph 33. The grievance is then taken up by the Shop Committee at a meeting with the Management. *Id.* at paragraph 33.

> A final decision on appealed grievances will be given by a representative of the highest Local Management within a maximum of fifteen working days from the date of the first written filing thereof unless a different time limit is established by local agreement in writing.

*Id.* at paragraph 34. Step three then provides that

> [i]f the grievance is not adjusted at this step and the Shop Committee believes it has grounds for appeal from the Plant Management decision, the Chair*person* of the Shop Committee will give the Plant Management a written "Notice of Unadjusted Grievance," on forms supplied by the Corporation, and the Chair*person* or designated member of the Shop Committee will then prepare a complete "Statement of Unadjusted Grievance," signed by the Chair*person* of the Shop Committee, setting forth all facts and circumstances surrounding the grievance.

\* \* \*

> The Plant Manager, or *a* designated *Management* representative, will also prepare a complete "Statement of Unadjusted Grievance" and the

---

[4] The court has been unable to determine the definition of the term "adjust" as used in the National Agreement. Judging by the context in which the word is used, it presumably means to "correct" or "settle." Accordingly, this is how the term will be interpreted for purposes of this motion.

9

> Management's reason in support of the position taken, signed by the Plant Manager or *an* authorized *Management* representative.

*Id.* at paragraph 37 (emphasis in original). The two sides then exchange their statements and the Chairperson of the Shop Committee forwards copies of the statements to the Regional Director of the International Union. *Id.* at paragraph 38. The agreement provides that "[i]f the Regional Director shall decide to appeal the case, notice *shall be given* on the form "Notice of Appeal" supplied by the Corporation, sending one copy to the local Plant Management and the Chair*person* of the Shop Committee." *Id.* The case is then heard at a meeting of an Appeal Committee consisting of equal members of management and Union officials. *Id.* at paragraph 39.

> If an adjustment of the case is not reached at this meeting, the Management will furnish a copy of its decision in writing and a copy of the minutes of the meeting, to the Chair*person* of the Shop Committee and the Regional Director within five working days after the meeting, unless this period is extended by mutual agreement in writing.

*Id.* at paragraph 42.

If the case still is not adjusted at this point, it may be appealed by either party to an Impartial Umpire, "providing it is the type of case on which the Umpire is authorized to rule." *Id.* at paragraph 43. Since paragraph 6a falls within the Recognition section of the National Agreement, the Umpire is authorized to rule on it. *Id.* at paragraph 46. "There shall be no appeal from the Umpire's decision, which will be final and binding on the Union and its members, the employee or employees involved and the Corporation." *Id.* at paragraph 53. The agreement further states that

> [a]ny grievance involving a dispute regarding an employee's job assignment which has resulted in a loss of work . . . or a refusal of Management to return

10

>an employee to work from sick leave of absence by reason of the medical findings of a physician or physicians acting for the Corporation, will be initiated at the Second Step, if such findings are in conflict with the findings of the employee's personal physician with respect to whether the employee is able to do a job to which *the employee* is entitled, in line with the *employee's* seniority, or do the disputed job assignment as the case may be.

*Id.* at paragraph 43(b). That procedure involves input by the employee's physicians, the GM physician, and a third party physician, if necessary. *Id.*

### B.  The Filing of a Grievance

The parties first dispute whether Ms. Stafford filed a grievance with the Union before commencing this action. However, in the plaintiff's March 12, 1996, deposition she admitted having never filed a formal grievance.[5] Ms. Stafford only cites her own affidavit as evidence to the contrary. *See Stafford Affidavit* at 1. However, whether Ms. Stafford filed a grievance before she instituted this action or after, the Federal Arbitration Act compels arbitration of her dispute if the court finds that the arbitration provision is applicable. *See* 9 U.S.C. § 3 (1987). As outlined above, the initial grievance is merely the first step in the arbitration procedure. Whether she filed a grievance or not has no effect on whether she must abandon her action here and turn to remedies under the National Agreement. Accordingly, the court need not decide this issue.

---

[5] The plaintiff and defense counsel engaged in the following exchange:

>Q.   Have you ever filed a formal grievance?
>
>A.   No.

*Stafford Depo. at 135.*

11

### C. Applicability of the National Agreement

The parties next dispute whether Ms. Stafford was an "employee" of GM so as to be covered under paragraph 6a of the National Agreement. The agreement defines employee as "all production and maintenance employees and mechanical employees in engineering department shops in the bargaining units covered hereby." *National Agreement* at paragraph 3. The plaintiff contends that at the time of the events complained of she "was employed by General Motors but not in a Collective Bargaining Unit job therefore not subject to the terms of the Collective Bargaining Agreement." *Plaintiff's Brief* at 14. Although the plaintiff then contends that "[t]his fact is set forth by the defendant's own testimony," she never cites any specific evidence to illustrate that point.

The defendant, however, does cite the evidence to which the plaintiff may have been referring--the deposition of Gary Campbell, Supervisor of Labor Relations at the Limestone County plant. The pertinent portion of that testimony reads:

> Q, How did you find out it was a temporary assignment?
>
> A. Well, one, it's not a bargaining unit job, first of all. And I think the placement was made in line with her restrictions by Dr. Lowery.
>
> \* \* \*
>
> Q. You said that it was not a bargaining unit job. What did you mean by that?
>
> A. Again, it's not captured under a seniority group which is identified in our contract.
>
> \* \* \*
>
> Q. Who told you -- how did you get the understanding that it was a temporary position?

12

> A. Well, as I indicated earlier, Ms. Story or Stafford is a bargaining unit employee. And the particular job assignment that she was on, or the function she was doing, is not covered under the local agreement as bargaining unit work.

*Campbell deposition* at 31-32, 35. Although Mr. Campbell does testify that Ms. Stafford was not in a bargaining unit job, he also says that she was a bargaining unit employee.[6] In addition, the defendant cites the declaration of Mr. Blaesing, who testified that Ms. Stafford "was already employed as an hourly, bargaining unit employee at the Limestone County site when I arrived at the site in April, 1993." *Blaesing Declaration* at paragraph 2.

*Black's Law Dictionary* defines "bargaining unit" as: "Labor union or group of jobs authorized to carry on collective bargaining in behalf of employees. A particular group of employees with a similar community of interest appropriate for bargaining." Unfortunately the parties have not cited, and the court has been unable to discover, what positions comprised the bargaining unit at issue in this case. Regardless, the uncontroverted evidence in this case establishes that Ms. Stafford was a "bargaining unit employee." The plain language of the National Agreement merely defines employees as "all production and maintenance employees and mechanical employees in engineering department shops in the bargaining units covered hereby." *National Agreement* at paragraph 3. As a bargaining unit employee, Ms. Stafford was "in" the bargaining unit as defined by paragraph 3.

---

[6] Thus far, the court has been unable to glean from the parties' submissions the difference, if any, between the two conditions. Only Mr. Campbell's deposition mentions both states, while not adequately describing either. However, because there is no evidence to the contrary, the court must assume that since he differentiates between the two conditions, an employee could be one without being the other. *See Campbell deposition at 32, 35.*

Even if Ms. Stafford was not "in" a bargaining unit, the National Agreement would still apply to her through principles of equitable estoppel. Ms. Stafford felt she was entitled to, and took advantage of, the protections given her under the National Agreement. It is undisputed that Ms. Stafford's original assignment to the Yard Crew was pursuant to paragraph 72 of the National Agreement. Also, between 1992 and 1995, when she asked to be placed in an equalization group, she was implementing rights granted her pursuant to paragraph 71 of the National Agreement. Therefore, it is clear that Ms. Stafford believed, at least at one time, that she was covered by the agreement and acted accordingly. She cannot claim rights under the National Agreement, then later disavow the duties she undertook when she entered into the contract. *See McBro Planning and Development Company v. Triangle Electrical Construction Company, Inc.*, 741 F.2d 342 (11th Cir. 1984). Therefore, plaintiff is also estopped from denying that National Agreement applies to her. She is subject to the arbitration/grievance procedure outlined therein.

### D.    **Effectiveness of the Grievance Procedure**

The plaintiff next argues that she "complained to the Union and General Motors but to no avail as the Union and General Motors were acting in concert so Ms. Stafford in effect had no one to complain to. There was no means for her to exhaust her administrative remedies as she was not entitled to any nor would the process have been effective." *Plaintiff's Brief* at 13. In essence then, the plaintiff also claims that any attempt to use the grievance and arbitration procedure would have been futile. However, "[t]he test for 'futility' is not . . . whether [an employee's] claims would succeed, but whether the employee[] could have availed [himself] of the grievance procedure." *Mason v.*

14

*Continental Group, Inc.*, 763 F.2d 1219, 1224 (11th Cir. 1985) citing *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 659 (1965). Since the plaintiff was always subject to the provisions of the National Agreement, she always could have availed herself of the grievance/arbitration procedure.

If Ms. Stafford had filed a grievance, she would have been protected from inadequate representation. The UAW Constitution provides that, if any employee feels his or her rights have not been adequately protected by the Union in the grievance procedure, the employee can appeal his case to the Public Review Board. *UAW Const. Art. 32 § 1*, at 84. The board consists of "impartial persons of good public repute not working under the jurisdiction of the UAW or employed by the International Union or any of its subordinate bodies." *Id.* The Public Review Board's purpose is to ensure "a continuation of high moral and ethical standards in the . . . Union," and is specifically entrusted with protecting the "rights and privileges of individual members" of the Union. *Id.* Accordingly, even if Ms. Stafford's claims were mishandled by the Union in the grievance procedure, she could have turned to an impartial body to vindicate her rights.

### E.  **Propriety of Arbitration**

The plaintiff last contends that, in the context of employment discrimination claims, the arbitration process is inappropriate as the sole and exclusive remedy, even if the parties to the claim have agreed to arbitrate.

Where the parties have agreed to arbitrate, the burden is on the plaintiff to show that Congress intended to preclude a waiver of a judicial forum for such claims. See *Gilmer v. Interstate, Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). The Supreme Court has stated:

15

> "[Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. . . . If such an intention exists, it will be discoverable in the text of the statute, its legislative history, or an inherent conflict between arbitration and the [statute's] underlying purposes."

*Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 880 (4th Cir. 1996), citing *Gilmer*, 500 U.S. at 26, quoting *Mitsubishi*, 473 U.S. at 628. In *Gilmer,* the Court found that in the context of the Age Discrimination in Employment Act of 1967, ("ADEA"), Congress did not preclude alternative dispute resolution such as arbitration, but instead encouraged it. *Gilmer*, 500 U.S. at 26. The Court also withdrew its earlier criticism of the arbitration process. *Id.* at 30 ("Such generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.").

It has been the law for some time that Title VII cases are subject to compulsory arbitration. *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 (11th Cir. 1992). In *Brisentine v. Stone & Webster Engineering Corp.*, CV-95-N-1623-NE, this court examined whether, in ADA cases, Congress intended to preclude arbitration as a forum, and discovered that there is ample evidence that Congress intended just the opposite. Accordingly, for the reasons stated by the Eleventh Circuit in *Bender* and this court in *Brisentine*, Title VII and ADA cases are subject to compulsory arbitration.

However, because the contract at issue here is a collective bargaining agreement, special concerns arise. The Supreme Court expressed these concerns in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), and held that a plaintiff who arbitrated contractual

grievances pursuant to a collective bargaining agreement was not precluded from bringing statutory claims in federal court. In *Alexander*, the Court was concerned with the potential disparity of interests between a union and an employee. However, many of those concerns were dispelled in *Gilmer* when the Court held that arbitration is an "effective forum in which a prospective litigant may effectively vindicate [his] statutory cause of action. *Gilmer*, 500 U.S. at 28. The Court distinguished *Alexander*, holding that

> [f]irst, in *Alexander*, the employee had brought a contractual claim based on the collective bargaining agreement to a grievance committee. This contractual claim was quite different from the Title VII statutory claim, even though the two claims arose from the same conduct. The employees had not agreed to arbitrate their statutory claims. Second, the Supreme Court was concerned that in the collective bargaining process, the interests of the individual might be subordinated to the collective interests of employees in the bargaining unit: *Alexander* was designed to ensure that an individual's statutory rights were not lost in the collective bargaining process. Third, and most importantly, the *Alexander* cases were not decided under the FAA and did not involve agreements to arbitrate.

*Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 (11th Cir. 1992), *Gilmer*, 500 U.S. at 20. The *Gilmer* Court thus defended mandatory arbitration because even if a union bargains away the right to proceed in a judicial forum, the plaintiff has not lost the ability to protect his individual interests.

The Eleventh Circuit has not addressed the issue of whether ADA or Title VII claims are subject to compulsory arbitration under a collective bargaining agreement; however, in *Austin v. Owens-Brockway Glass Container Inc.*, 78 F.3d 875 (4th Cir. 1996), the Fourth Circuit held that ADA and Title VII actions are subject to such action. In *Austin* the plaintiff brought suit in federal court alleging violations of Title VII and the ADA. The district court granted summary judgment because the plaintiff failed to submit his claims to mandatory

17

arbitration under a collective bargaining agreement. In affirming the district court, the Fourth Circuit addressed the Supreme Court's concerns and found that "[w]hether the dispute arises under a contract of employment growing out of securities registration application, a simple employment contract, or a collective bargaining agreement, an agreement has yet been made to arbitrate the dispute. So long as the agreement is voluntary, it is valid, . . . [and] it should be enforced." *Id.* at 885. The court stated that "[t]here is no reason to distinguish between a union bargaining away the right to strike and a union bargaining for the right to arbitrate. The right to arbitrate is a term or condition of employment, and as such, the union may bargain for this right . . . . 'Plainly the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike.'" *Id.* at 885 (citations omitted). This court agrees. Thus, the collective bargaining nature of the labor contract at issue does not preclude the arbitration of the ADA or Title VII claims.

### V.     **Conclusion**

Because Ms. Stafford's statutory claims are subject to compulsory arbitration under the agreement, it follows that she must first go through the grievance procedure before filing suit in federal court. *Republic Steel v. Maddox*, 379 U.S. 650, 652 (1965). The defendant's motion for summary judgment will be granted; the action will be dismissed without prejudice; the court will retain jurisdiction; and either party will be allowed to petition to reopen the matter at the conclusion of arbitration, provided there remain viable issues to be heard by the court.

Done, this __17th__ of January, 1997.

_____
Edwin L. Nelson
United States District Judge